IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ALICIA DAVENPORT,,                    *

          Plaintiffs,,                *

vs.,                                  *        CASE NO. 4:06-CV-150 (CDL)

CITY OF COLUMBUS, GEORGIA, *et*       *
*al.*,
                                      *
          Defendants.                 *
_____ *

O R D E R

Plaintiff, Alicia Davenport, brings claims against the Columbus Consolidated Government, its former mayor and several of its employees for race and sex discrimination and retaliation. Presently pending before the Court is Defendants' Motion for Summary Judgment (Doc. 45). As discussed below, the motion is granted in part and denied in part.

INTRODUCTION

Plaintiff, a black female, was employed as an undercover police officer with the Columbus Police Department. Plaintiff claims that she did not receive the same level of support during her undercover assignments that male and white female undercover officers received. She contends that this lack of support was the result of race and gender discrimination. Plaintiff also maintains that she was subjected to a sexually hostile work environment. When she complained of discrimination and sexual harassment, Plaintiff alleges

1

that she was retaliated against by her supervisors, including the chief of police. This alleged retaliation included a transfer from the Vice Unit to Patrol and a Letter of Counsel in Plaintiff's employment file. Plaintiff brings claims for discrimination and retaliation under 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), 42 U.S.C. § 1983 ("§ 1983"), and Georgia state law.

As discussed below, the Court finds that genuine issues of material fact exist as to the following claims:

1.  Title VII claim against the City for discrimination based on unfavorable undercover working conditions.

2.  Title VII and § 1981 claims against the City for retaliation based on Plaintiff's transfer from Vice to Patrol and the September 2006 Letter of Counsel.

3.  Section 1981 claims against Chief Boren in his individual capacity based on Plaintiff's transfer from Vice to Patrol and the September 2006 Letter of Counsel.

4.  Section 1981 and equal protection claims against officers Horiuchi, Spear and Walton in their individual capacities based on Plaintiff's undercover working conditions.

Therefore, the Court denies summary judgment as to these claims, and they shall proceed to trial. Defendants' motion for summary judgment is granted as to all of Plaintiff's other claims.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the

2

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A central purpose of the summary judgment rule is "to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact. *See id.* at 323. To meet this burden, the movant may point the court to "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the movant may show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the summary judgment movant meets its burden, the burden shifts and the nonmoving party must produce evidence to show that there *is* a genuine issue of material fact. *See Celotex Corp.*, 477 U.S. at 324. The nonmoving party must "go beyond the pleadings," *id.,* and point the Court to "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); *accord Celotex Corp.*, 477 U.S. at 324. The nonmoving party is not required to produce evidence in a form that would be admissible at trial, but it must point to some evidence to show a genuine issue of material fact. *Celotex Corp.*,

477 U.S. at 324. Such evidence may be in the form of affidavits, depositions, answers to interrogatories or admissions on file. *Id.*; *accord* Fed. R. Civ. P. 56(e).

The movant is entitled to summary judgment if, after construing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in favor of the nonmoving party, no genuine issues of material fact remain to be tried. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). It is not enough to have *some* alleged factual dispute; there must be a genuine issue of material fact to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party—there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Anderson*, 477 U.S. at 248.

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following:

## I.  The Plaintiff

Plaintiff, Alicia Davenport, is a black female. From January 2004 until September 2006, she was employed as a police officer with the police department of the Columbus Consolidated Government

("Columbus" or "the City"). During her tenure at the Columbus police department, Plaintiff worked as an undercover officer in the Vice and Narcotics Unit ("Vice"), and she also worked in the Patrol Division, Desk Services, and Property and Evidence.

## II.  The Defendants[1]

Defendant Columbus is a consolidated city-county government. At the time of the events giving rise to this lawsuit, Defendant Poydasheff, a white male, was mayor and Director of Public Safety of Columbus.  As mayor, Poydasheff was charged with the general oversight of the police department, but he was not responsible for managing and operating the police department, he did not play a role in establishing, implementing or modifying police department policies, and he did not have daily operational control over the police department.  (Poydasheff Decl. ¶ 2, Dec. 19, 2007.) Poydasheff did not have a role in supervising Plaintiff's police unit or work activities.  Plaintiff has pointed the Court to no evidence that would support any claims against Poydasheff for discrimination or retaliation; therefore, Poydasheff is entitled to summary judgment on Plaintiff's claims against him in his individual capacity.

Defendant Boren is, and was during the relevant timeframe, police chief of Columbus.  Boren, a white male, reports to the

---

[1]Plaintiff sued all of the individual Defendants in their official and individual capacities.  The official capacity claims are considered claims against the City. *See Smith v. Allen*, 502 F.3d 1255, 1272-73 (11th Cir. 2007) (official capacity suit is another way of pleading an action against the entity of which an officer is an agent).

Columbus mayor and is responsible for the overall management and operation of the police department. Defendant Hawk, a white male and captain in the Columbus police department, was commander of the Vice Unit during the relevant timeframe. Defendant Spear (erroneously sued as "Spears") is a detective in the Columbus police department, and he was assigned to Vice during the relevant timeframe. Defendant Horiuchi, an agent in Vice during the relevant timeframe, was Plaintiff's immediate supervisor after he was promoted to sergeant in October 2005. Horiuchi, an Asian male, and Spear, a white male, oversaw Plaintiff's activities as an undercover officer. Defendant Walton, a black male, was a sergeant in Vice during the relevant timeframe. Walton was Plaintiff's immediate supervisor from the time she was assigned to Vice until Horiuchi became her supervisor in October 2005. After Horiuchi became Plaintiff's supervisor, Walton still had a position of supervisory authority over Plaintiff. (Walton Dep. 178:24-179:2, Sept. 7, 2007 [hereinafter Walton Dep. II].)

Defendant Todd, a white male, is the captain in charge of the Columbus police department's Support Services, which includes Desk Services. Larry Parker was Plaintiff's immediate supervisor when Plaintiff worked in Desk Services. (Parker Dep. 10:5, Dec. 10, 2007.) Parker reported to Todd, who reported to Defendant Swiney, a white male who is a major in the Columbus police department with overall management responsibility for Support Services.

Defendant Barron is the director of human resources for Columbus. Barron received a copy of Plaintiff's internal complaint of discrimination and harassment, but he did not play any role in the investigation of that complaint. (Barron Dep. 6:13-8:15, Dec. 17, 2006.)[2] Plaintiff has pointed the Court to no evidence that would support any claims against Barron for discrimination or retaliation; therefore, Barron is entitled to summary judgment on Plaintiff's claims against him in his individual capacity.

## III. The City's "Fair Treatment Policy"

During her initial orientation, Plaintiff received training on the City's Fair Treatment and Equal Employment Opportunity ("EEO") policies, and she was given a copy of these policies. Plaintiff's training included an explanation of how to file a complaint of discriminatory or harassing treatment. The Fair Treatment Policy

---

[2]Plaintiff contends that Barron had authority "to intervene and to insure [sic] that Plaintiff would not suffer the continuing and repeated retaliation against her as a result of her complaints of race and sex discrimination, but that he failed and refused to do so, by his own admission." (Pl.'s Resp. to Defs.' Statement of Material Facts as to Which There is No Genuine Issue to be Tried ¶ 8(a) [hereinafter Pl.'s SMF].) However, Plaintiff points the Court to no evidence supporting this statement. Rather, the evidence shows that while Barron had overall responsibility for the City's Fair Treatment program (*see* Barron Dep. at 4:21), Chief Boren was responsible for investigating Plaintiff's complaint (*id.* at 7:3-11; Ex. 3 to Pl.'s SMF, Memorandum, Jan. 12, 2006.). Furthermore, although Barron asked Plaintiff to let him know if she had questions or her complaint was not appropriately addressed (*see* Ex. 3 to Pl.'s SMF), Plaintiff did not contact Barron after she submitted her initial complaint, (*see* Barron Dep. at 10:4-13). Plaintiff also contends that Barron knew about but did not investigate anonymous letters purportedly sent to City Council regarding potential problems with the investigation of Plaintiff's grievance. (Pl.'s SMF ¶ 8(a).) However, Plaintiff points the Court to no supporting evidence. Barron specifically testified that he did not recall such letters. (Barron Dep. at 13:1-21, 14:25-15:2.)

instructs Columbus employees to attempt to resolve complaints with their immediate supervisors or, if that fails, with their Department Director. (Ex. M to Defs.' Statement of Material Facts as to Which There is no Genuine Issue to be Tried [hereinafter Defs.' SMF], City Fair Treatment Policy [hereinafter Fair Treatment Policy].) The Fair Treatment Policy also explains that an employee's complaint of discrimination or harassment "may be presented directly to the Human Resources Director, the Affirmative Action Officer or the Departmental EEO Counselor." (*Id.*)

Plaintiff asserts that neither the Fair Treatment Policy nor the training instructed her on how undercover officers were supposed to file a complaint when they were not permitted to disclose their undercover identities and were instructed not to enter the police department building. (Pl.'s SMF ¶ 13; Pl.'s Aff. ¶ 2, Feb. 20, 2008.)

## IV. The Vice and Narcotics Unit

In the Vice and Narcotics Unit, the officers were not discouraged from using casual profanity and other "street" language that would help them blend in with the drug culture on the street and therefore protect them from discovery. The relaxed environment existed so that the agents would not have to switch back and forth between an office persona and a street persona. The chain of command in Vice was relaxed, although the agents were still required to conform to the chain of command and the police department's policies and procedures. According to Plaintiff, Vice was like a locker room,

and the other officers used profanity all the time. Although other officers said that Plaintiff fit into the Vice environment and frequently used profane language (*e.g.,* Rebout Decl. ¶ 6, Oct. 30, 2007), Plaintiff denies using profanity except when she assumed her undercover role, (Pl.'s Dep. 69:23-70:8, June 7, 2007.)

## V. Plaintiff's Undercover Assignment

In the summer of 2004, as Plaintiff was completing her Columbus police recruit training, Hawk and Walton approached Plaintiff about doing an undercover assignment with Vice. It was common for the police department to ask new officers to work undercover because the new officers were less likely to be recognized as police. (Walton Dep. 29:6-20, Aug. 29, 2007 [hereinafter Walton Dep. I].) In addition, Boren and Hawk wanted to recruit a female to work undercover in Vice because there was no female officer in Vice at the time. (Hawk Dep. 54:18-24, Nov. 27, 2007.)[3] Boren approved Plaintiff's undercover assignment in Vice, and Plaintiff believed the assignment would provide her with great experience. It is undisputed that working in Vice is a "fast track" to promotion. (*E.g.*, Hawk Dep. at 30:3-6.)

---

[3]Plaintiff contends that she was chosen for the operation "in part because Walton wanted to pursue her sexually" and that Walton assigned Plaintiff to work with "white males whom he knew would not be rivals to his sexual quest for [Plaintiff]." (Pl.'s SMF ¶ 21.) However, there is a tremendous gap between these assertions and Walton's testimony, which Plaintiff cites in support of them. Walton simply testified that he decided not to assign Plaintiff to work with an officer who was "known as a ladies' man" because Walton "didn't want any flirting or anything like that going on." (Walton Dep. II at 190:6, 191:6-7.)

For her first assignment with Vice, Plaintiff participated in an undercover drug buy. After Plaintiff succeeded in that assignment, Walton and Hawk believed that Plaintiff was "a natural" for undercover duties because she was "street smart" and able to blend in on the scene of her assignment. Vice undercover operations were staffed with officers who were most likely to blend in with the surroundings of the target. The primary targets for Plaintiff's undercover assignment were nightclubs where most of the patrons were black, and Plaintiff "seemed like a perfect fit for the operation," particularly since she was "smart and quick to fall in to the 'street talk' drug dealers used." (Hawk Decl. ¶ 5, Dec. 5, 2007.)

Hawk met with Plaintiff to ask if she would be willing to accept a temporary assignment as an undercover officer, and Plaintiff agreed. At the time, Plaintiff was assigned to the Patrol Division and had not yet completed her patrol training.[4] Walton and Hawk told Plaintiff that they were going to keep Plaintiff undercover, that she had to keep the assignment a secret from everyone, and that she would not be allowed to go to police headquarters. (Walton Dep. I at 31:8-32:1.) Walton explained that he "wanted people to believe that she had left the police department," and he advised Plaintiff to tell anyone who asked that she was on medical leave from her police duties. (*Id.*) The only people who were supposed to be aware of

---

[4]Plaintiff was still required to complete her patrol field training, but the training was on hold while Plaintiff worked on the undercover assignment. (Pl.'s Dep. at 368:18-24.)

Plaintiff's undercover assignment were her team members—Walton, Horiuchi and Spear—and their supervisors, Hawk and Boren. However, there is evidence that in August 2004 someone other than Plaintiff leaked Plaintiff's undercover status to a patrol officer. (Pl.'s Dep. at 366:2-15; Attach. 1 to Lehman Decl. 3, Nov. 2, 2007.)[5] Plaintiff contends that Horiuchi leaked the information.

The following facts regarding Plaintiff's undercover assignment are generally undisputed. Plaintiff was issued an unmarked car and a camera cell phone for her undercover assignment. Hawk told Plaintiff that she would work exclusively with Spear and Horiuchi on a comprehensive drug investigation to be conducted inside Columbus nightclubs suspected of drug activity. The nightclubs included Firehouse, the Golden Cue, Rodgers Tap Room, the Antifreeze Club, and Blues Connection.[6] While on her undercover assignment, Plaintiff generally only interacted with Walton, Horiuchi and Spear, although she did also see Hawk occasionally. (Hawk Dep. at 51:10-11.) Plaintiff was assigned to visit the clubs on a regular basis so that she could form relationships with other patrons and build up trust with suspected drug dealers so that they would sell her drugs or offer to buy drugs for her. Each evening, Spear and Horiuchi called or met with Plaintiff to instruct her as to which club or clubs she

[5]There is evidence that Plaintiff told others about her assignment, although Plaintiff denies it. (*E.g.*, Wiggins Decl. ¶ 3, Oct. 23, 2007.)

[6]Plaintiff contends, but Defendants deny, that Plaintiff was also sent to a strip club called Carousel. (Pl.'s Dep. at 152:23-24.)

11

was to visit.  Plaintiff went into the clubs alone when she was establishing relationships with the patrons.  Plaintiff did not wear a body wire most of the time when she went to the clubs to build relationships with the patrons.[7]  It is not seriously disputed that the clubs targeted in the investigation were suspected of drug activity and were potentially dangerous.  Standard departmental procedure required undercover details to include at least two agents to provide cover to the undercover operative from a safe distance. Spear and Horiuchi were supposed to be stationed outside a club when Plaintiff was inside in case she needed assistance.  (Hawk Decl. ¶¶ 3, 7.)  Plaintiff did not participate in operational planning or briefing while she was undercover.  Plaintiff received good performance reviews for her undercover work.  (Ex. 6 to Pl.'s SMF, Employee Achievement Assessment, Dec. 7. 2005; Ex. 7 to Pl.'s SMF, Employee Achievement Assessment, Dec. 7, 2004.)

Other than the facts recounted above, the parties agree on very little regarding the mechanics of Plaintiff's undercover assignment. Again, the Court must view the evidence in the light most favorable to Plaintiff and draw all justifiable inferences in her favor.  *See*

---

[7]According to Defendants, Plaintiff did not wear a body wire because the clothes she wore to blend in to the nightclub atmosphere would not conceal a wire, because wires were useless in noisy clubs and because they worried that Plaintiff would be in danger if she were patted down and the wire discovered.  Plaintiff admitted in her deposition that a listening device "would be useless" inside the clubs because she "wouldn't think you could hear anything with a wire" due to the loud music, loud talking and other noise.  (Pl.'s Dep. at 91:17-24.)  When Plaintiff made drug buys, she did not usually wear a wire, but the informant with whom she worked on the buy did.  (*Id.* at 87:23-88:4, 114:13-16.)

*Anderson*, 477 U.S. at 255. According to Plaintiff, Spear and Horiuchi often sent Plaintiff into nightclubs to do undercover work but did not provide any cover, contrary to standard departmental procedure.[8] (*E.g.*, Pl.'s Dep. at 99:13-15, 102:1-103:7, 139:21, 162:8-19; 179:19-181:13; Pl.'s Aff. ¶ 12.) When Horiuchi and Spear started sending Plaintiff into clubs by herself and without cover, Plaintiff asked them why they could not be there with her, and she also complained to Walton, Horiuchi and Spear that she felt unsafe, particularly because she believed that she had been "made" on more than one occasion. (Pl.'s Dep. at 124:11-125:15, 170:15-177:25.) When Plaintiff asked why she did not have cover, Horiuchi and Spear told her: "[T]his is how things go. This is how it's always been done." (*Id.* at 176:7-8.) Hawk became aware of one time when Plaintiff went into a nightclub without proper cover, and he instructed Walton to tell Horiuchi and Spear not to let it happen again. (Hawk Dep. at 22:22-23:23.) According to Plaintiff, however, she was sent into clubs five or six times a week throughout 2005, and she usually did not have cover.[9] (Pl.'s Dep. at 139:15-21, 155:8-13.)

---

[8]Defendants agree that it is important to provide cover for undercover operatives. They contend that they provided cover for Plaintiff every time she went into a club and that the only time Plaintiff did not have cover was when she went clubbing on her own without being instructed to do so. (*E.g.*, Spear Decl. ¶ 20, Dec. 20, 2007.) Plaintiff stated that she never went to a club unless instructed to do so. (Pl.'s Aff. ¶ 6.)

[9]For example, sometime in late summer or early fall 2005, Plaintiff spoke with Walton specifically to "gripe" that she was still being sent to clubs by herself. (Pl.'s Dep. at 227:15-18, 228:10-18; *see also* Defs.' SMF ¶ 86.)

13

In addition to cover, Horiuchi and Spear were supposed to provide Plaintiff with operational funds, as well as gas for her unmarked car. (Pl.'s Dep. at 78:2-3; Walton Dep. I at 53:13-54:25, 55:24-56:8.) According to Plaintiff, Horiuchi and Spear did not regularly get gas for Plaintiff's unmarked car, and she had to purchase her own gas but was not reimbursed for it. (Pl.'s Dep. at 78:5-79:9, 139:15-18.) In addition, Horiuchi and Spear did not give Plaintiff operational funds after the first few weeks of the undercover assignment, and Plaintiff had to spend her own money.[10] (*E.g.*, *id.* at 133:10-19, 144:7-9.) There is some evidence that the provision of operational funds was tied to the provision of cover; if Plaintiff was sent out to a club by herself, she would not receive any operational funds or gas for her car. (*E.g.*, *id.* at 79:14-16.) Plaintiff spoke with Walton several times about these problems, but they were not remedied. (*Id.* at 79:12-20.) According to Plaintiff, the only time Horiuchi and Spear put gas in her car was when she was making a drug buy, and she did not generally receive operational funds during 2005, even though she was sent into clubs five or six times a week throughout that year. (*Id.* at 139:15-21, 155:8-13.)

---

[10]According to Defendants, Plaintiff received operational funds but did not generally need them after she became a regular at the clubs because the clubs waived her cover charge and other patrons purchased her drinks. (Spear Decl. ¶ 15.) Defendants assert that the only time Plaintiff was not provided with operational funds was when she went clubbing on her own time. (Spear Decl. ¶ 21.)

It is undisputed that the undercover operation did not garner as many arrests as had been expected, though the reason for the low number of arrests is disputed. In any event, the undercover operation ended in late November or early December 2005, and Horiuchi and Spear told Plaintiff to come into the office so she could wrap up her cases and learn more about the Vice Unit's activities. Plaintiff worked in the same area as the other Vice officers, and she got along well with the rest of the group.

Although Defendants contend that Plaintiff's assignment to Vice was temporary because she still had to finish her patrol field training, there is some evidence that Defendants planned to keep Plaintiff in Vice permanently.[11] (Hickey Dep. 49:12-20, Aug. 14, 2007; Pl.'s Dep. at 198:18-25; Hawk Dep. at 32:8-12.) Hawk assigned Detective Byron Hickey and Detective Dechon Grant, both of Vice, to train Plaintiff on Vice policies and procedures. (Hawk Decl. ¶ 14.) During this training, Plaintiff learned departmental procedures for undercover operations, including the requirement that undercover operatives have at least two agents providing cover. (*E.g.*, Pl.'s Dep. at 276:3-16.)

**VI.  Plaintiff's Sexual Harassment Allegations**

---

[11]Defendants contend that Plaintiff was not qualified for permanent assignment to the Vice unit because a permanent assignment would have required several more years of police service. (Defs.' SMF ¶ 68.) There is evidence that Defendants planned to keep Plaintiff in Vice anyway. (*E.g.* Hawk Dep. at 32:8-12.)

During and following the undercover operation, Horiuchi engaged in sexually explicit discussions in front of Plaintiff,[12] and Horiuchi spoke on the telephone with his girlfriend about sex. (*E.g.*, Pl.'s Dep. at 66:17-68:20, 207:6-209:1.) Plaintiff told Horiuchi and Spear that these conversations were disrespectful and asked them to stop, but they did not. Plaintiff also complained to Walton that Horiuchi was disrespectful to her, treating her like an informant and not like a fellow officer by cursing at her and giving her commands. (*Id.* at 135:22-136:16.) In December 2005, Plaintiff took part in a prostitution detail along with Horiuchi, Spear, and other Vice agents, including David Josey, Byron Hickey, Dechon Grant, and Bill Tuning. Plaintiff's role was to check the females for drugs or weapons after the team arrested them. (*Id.* at 333:17-19.) Plaintiff contends that the members of the team inappropriately handled the detail by waiting until the prostitutes completely undressed before they made an arrest. (*Id.* at 333:24-335:18.) Plaintiff also asserts that Spear instructed her to watch the video feed of the undercover detail, which included images of naked female prostitutes. (*Id.* at 338:8-339:9.) When Plaintiff objected, Spear told her she needed a better attitude to work in Vice. (*Id.*)

Plaintiff also contends that Walton made sexual advances toward her. In August of 2005, Walton asked Plaintiff to visit him at his

---

[12]Spear did not talk about sex in front of Plaintiff, but he did provide an audience for Horiuchi. (Pl.'s Dep. at 69:1-5.)

part-time security job, and Plaintiff went to try and talk with him about work-related matters, such as being sent out to clubs without proper cover.[13] It is undisputed that as Plaintiff was leaving, Walton asked her, "Aren't you going to sit in my lap?" (Defs.' SMF ¶ 89.) Plaintiff yelled "no." (Pl.'s Dep. at 232:8-11.) On another occasion, Walton went to Plaintiff's house to deliver a bonus check, and it is undisputed that he asked if Plaintiff would "give [him] some tongue."[14] (Defs.' SMF ¶ 84; Pl.'s Dep. at 243:24-244:6.) After Plaintiff was brought in from undercover, Walton put his arm around Plaintiff and pushed his body against hers.[15] (Pl.'s Dep. at 233:2-234:6.) On another occasion, while Plaintiff was eating a large hamburger, Walton asked her how wide she could open her mouth, and Plaintiff believed that Walton was implying something about oral sex. (*Id.* at 235:5-236:1.) In addition, when Plaintiff brought her boyfriend to the Vice unit's Christmas party, Walton appeared to be jealous, and he told Plaintiff, "I guess you're just not attracted to me." (*Id.* at 221:22-25.)

---

[13]Walton recalls the conversation differently—he believes he spoke with Plaintiff about another police officer who was arrested and asked Plaintiff to help with his bond and about Plaintiff's concerns regarding her productivity in terms of the undercover assignment.

[14]Although Walton apparently believed this was friendly banter, (Defs.' SMF ¶ 84), Plaintiff did not. (Pl.'s Dep. at 244:3-6.) Plaintiff believes this incident took place in August of 2005. (*Id.* at 213:11-12.)

[15]According to Defendants, Walton grabbed Plaintiff by the shoulders to prevent a civilian from identifying Plaintiff or hearing their conversation. (Defs.' SMF ¶ 85.)

It is undisputed that Plaintiff did not complain to anyone other than Horiuchi, Spear and Walton about this conduct until she filed her grievance on January 3, 2006.

## VII. The December 30, 2005 Briefing

On December 30, 2005, the Vice Unit had an operational briefing to prepare for the night's operation. Horiuchi led the briefing, which was attended by Plaintiff, Spear, Hickey, Grant, Detective David Josey and Detective Bill Tuning. In addition, Jordan Tharp, a civilian, 19 year-old white female, attended the briefing. The purpose of the operation was to send Tharp to nightclubs in downtown Columbus so that Tharp could attempt to gain entry into clubs without identification that proved her age. The plan was for Plaintiff to go into each club with her camera phone and to take a picture of any club employee who permitted Tharp to enter the club without ID. Plaintiff and other members of the team were instructed to provide cover for Tharp, and Horiuchi joked that the team had better take good care of Tharp or her father, an employee of the sheriff's department, would kill them. That is where Plaintiff's version of the briefing diverges from Defendants' version. Again, the Court must view the evidence in the light most favorable to Plaintiff. *Anderson*, 477 U.S. at 255.

According to Plaintiff, Plaintiff asked why she did not receive the same type of treatment when she worked undercover.[16] Although Plaintiff was admittedly "upset" and "no longer appeared to be calm" (Hickey Dep. at 90:7-20), Plaintiff contends that she never lost her temper and was simply speaking her mind as other officers had always been allowed to do. (*See* Walton Dep. I at 18:16-21 (noting that Vice "regularly allowed the officers to speak their mind.").) Plaintiff admits that she commented that it was "bullshit" for the officers to provide cover to Tharp when the same had not been done for her.[17] (Pl.'s SMF ¶ 60.) Horiuchi instructed Plaintiff to leave the room, and she did so. At that point, Walton came from his office to see what was happening, and Walton and Horiuchi both yelled at Plaintiff, then Walton told Plaintiff that she would be going back to Patrol, and he told her to go home or she would find herself sitting at home without pay. (Pl.'s Dep. at 260:14-19.) Plaintiff responded to Walton: "[Y]ou didn't say [I was] going to have money missing out of my check when you asked me to sit on your lap." (Pl.'s SMF ¶ 62; *see also* Defs.' SMF ¶ 62.)[18]

---

[16]The parties agree that Spear quipped that Plaintiff, as a police officer, sat right below God and did not need protection.

[17]According to Hickey and Grant, the word "bullshit" is commonly used in the Vice unit and not considered a curse word. (Hickey Dep. at 94:25-95:3; Grant Dep. 91:12-15, Dec. 14, 2007.)

[18]Defendants' side of the story: Plaintiff lost her temper and began cursing and yelling, asking why she should "give a shit about this fucking white bitch." (*E.g.*, Tharp Decl. ¶ 6, Aug. 27, 2007; Tuning Decl. ¶ 16, Oct. 29, 2007.) Horiuchi ordered Plaintiff to be quiet, but she continued yelling and cursing so loudly that Walton heard it from his office and went

After Plaintiff left, Walton called Hawk and told him that Plaintiff had lost her temper in an operational briefing, had cussed out Walton and Horiuchi in front of a civilian, and had said something that made Walton believe that Plaintiff was going to accuse Walton of sexual harassment. (Hawk Decl. ¶ 16.) Walton also told Hawk that he had sent Plaintiff home. (*Id.*) Hawk called a meeting for the next day, December 31, 2005. Hawk did not attempt to get in touch with Plaintiff, but he instructed Horiuchi to contact Plaintiff to tell her about the meeting. However, according to Plaintiff, no one informed her of the meeting, (Pl.'s Dep. at 265:2-8.), and she called in sick on December 31.

Hawk conducted the meeting on December 31. Plaintiff did not attend the meeting. Hawk asked each agent to write a statement about what happened during the briefing. Although several agents recall drafting or submitting a statement to Hawk, Hawk does not recall collecting the statements, and Defendants cannot locate the statements. (Defs.' SMF ¶ 64 n.2.)

On January 3, 2006, the first work day after the New Year's holiday, Plaintiff went into the office before her shift to meet with Hawk about the December 30 briefing and to turn in a written grievance. Hawk told Plaintiff what had been related to him about the December 30 briefing, and he told her that it was "pretty bad" to

to see what was happening. Walton told Plaintiff to settle down, but Plaintiff continued yelling and cursing. Walton told Plaintiff to go home. She continued to yell and curse but then finally went home.

cuss a supervisor in front of a civilian. (Hawk Dep. at 29:7-18.) Plaintiff told Hawk that she did not cuss her supervisor but then admitted to Hawk that she "could have" done so. (*Id.* at 29:21-25.) Hawk then told Plaintiff that she would be going back to Patrol to complete her field training. (*Id.* at 30:9-14.) Plaintiff presented him with a written grievance dated January 2, 2006, alleging race and sex discrimination by Horiuchi and Spear and sexual harassment by Walton. (Ex. 12 to Pl.'s SMF, Grievance, Jan. 2, 2006.) Hawk instructed Plaintiff to take the grievance to Personnel, and he told her that he would take her complaint to Boren.

Plaintiff took her grievance to Personnel. Meanwhile, Hawk took a copy of the grievance to Boren. Personnel sent Plaintiff to Boren's office and also told her to give a copy of her grievance to Barron and to Reather Hollowell, the City's EEO officer. When Plaintiff arrived at Boren's office, Boren already had a copy of Plaintiff's grievance. He read Plaintiff's grievance; then he called in Major Charles Rowe, head of the police department's Office of Professional Standards ("OOPS"), who read the grievance. Boren and Rowe told Plaintiff that they would conduct an investigation of her complaints, and Boren told Plaintiff that he was particularly concerned about the alleged sexual harassment. (Pl.'s Dep. at 271:25-272:5.) He reassigned Plaintiff to Patrol Services the next day so that Plaintiff "could not face further risk of exposure to any of the situations she described in her letter," so she could complete

her mandatory training, and because Plaintiff told Boren "that she could no longer work under her current circumstances." (Boren Decl. ¶¶ 7-8, Dec. 18, 2007.)

Boren immediately ordered an internal investigation of Plaintiff's grievance by OOPS. When the investigation began, Hawk, Walton, Horiuchi and Spear remained in the Vice unit, although Walton was placed on administrative assignment in February 2006 as a result of the investigation. Hawk, Walton, Horiuchi and Spear had no ongoing authority over Plaintiff. Plaintiff sent a letter entitled "Employment Complaint" to the Equal Employment Opportunity Commission ("EEOC") outlining her discrimination and retaliation claims, and the EEOC received the letter on January 12, 2006. (Ex. 63 to Pl.'s SMF, Letter to Atlanta EEOC Office, Jan. 12, 2006.) She followed up by completing a verified EEOC Charge Questionnaire alleging retaliation and discrimination based on race and sex, which the EEOC received on January 30, 2006. (Ex. DD to Defs.' SMF, Pl.'s First EEOC Charge.)

## VIII.    The Investigation

Rowe spoke with the City's EEO officer, Reather Hollowell, about Plaintiff's grievance. Rowe and Hollowell agreed that OOPS should initiate and spearhead the investigation into Plaintiff's grievance because, in addition to allegations of discrimination, the grievance

contained allegations that Vice had been managed and operated in a highly improper manner.[19]

Rowe and his OOPS investigators completed their investigation at the end of April 2006. Rowe sent Boren a memorandum summarizing his findings on April 26, 2006. Rowe also sent Boren all of the supporting documentation—which was voluminous—in May and June so that Boren could review the entire file and respond appropriately. In July of 2006, Boren began disciplining members of the Vice unit as a result of Rowe's investigation into Plaintiff's grievance.

On July 19, 2006, Boren issued a Letter of Reprimand to Hawk. (Attach. 2 to Boren Decl.) Boren found that Hawk failed to exert sufficient operational and administrative control over the Vice unit's activities. Boren also found that the lax atmosphere in Vice and failure to follow Columbus police department procedures were conducive to poor performance by the Vice unit. As a result, Hawk was relieved of his command, and he was transferred to other duties. (Boren Decl. ¶ 15.1.)

On July 21, 2006, Boren issued a suspension and written counseling to Walton. (Attach. 3 to Boren Decl.) Walton was exonerated of sexual harassment, but Boren found that Walton failed to maintain a proper supervisor/subordinate relationship with Plaintiff and that he made inappropriate comments to Plaintiff.

---

[19]Hollowell observed internal investigation interviews that were relevant to Plaintiff's claims of harassment and discrimination, and she advised Rowe when he needed to ask questions related to those issues.

Accordingly, Boren suspended Walton for three days without pay, and he required Walton to attend sexual harassment training. Boren also counseled Walton regarding lax record keeping that made it difficult for OOPS to determine the dates and times when Plaintiff had worked as an undercover officer. In addition, Boren transferred Walton out of Vice and into the Patrol Division.

On August 7, 2006, Boren issued Horiuchi a written reprimand for his lack of professionalism with Plaintiff and for failure to keep sufficient records regarding Plaintiff's undercover activities, including operational funds vouchers. (Attach. 4 to Boren Decl.; Boren Decl. ¶ 15.3.) Horiuchi was also transferred to Desk Services.

On August 21, 2006, Boren issued Spear a Letter of Counsel for failure to keep sufficient records regarding Plaintiff's undercover activities, including operational funds vouchers. (Attach. 5 to Boren Decl.) In addition, Spear was transferred to Investigative Services.

On August 22, 2006, Boren issued David Josey, another Vice agent, a Letter of Counsel for failure to keep sufficient records regarding Plaintiff's undercover activities, including operational funds vouchers. (Attach. 6 to Boren Decl.) Josey remained in Vice.

On September 19, 2006, Boren sent Plaintiff a letter responding to her January 3 grievance.[20] (Attach. 7 to Boren Decl.) In the

_____

[20]The internal investigation ended in August 2006, but Boren decided not to send the letter to Plaintiff until September because she was on maternity leave in August, and he did not want to interrupt her maternity leave. (Attach. 7 to Boren Decl. 1.)

letter, Boren informed Plaintiff of the outcome of the investigation into her grievance. He also told Plaintiff that the investigation revealed evidence that Plaintiff had been disrespectful and insubordinate during the December 30, 2005 briefing when she "lost [her] temper and used profanity in front of [her] supervisor, [her] fellow officers, and an underage civilian." (*Id.* at 2.) Accordingly, part of the letter included counseling[21] reminding Plaintiff to maintain a professional demeanor and to use the established grievance procedures if she experienced workplace problems in the future. (*Id.* at 2-3.) It is not seriously disputed that Plaintiff did not receive notice or a hearing regarding the insubordination allegations against her.

## IX. Plaintiff's Subsequent Assignments

In late January 2006, Plaintiff informed the police department that she was pregnant, and she was assigned a light duty position in Desk Services. Plaintiff's immediate supervisor was Sgt. Larry Parker, who reported to Todd, who reported to Swiney.[22] At Desk

---

[21]A Letter of Counsel is a type of disciplinary action defined by the Columbus Police Department. (Ex. 41 to Pl.'s SMF, Disciplinary Policy, § 1-7.2(A).) Although, it is not a formal reprimand and does not result in formal discipline, such as suspension without pay, a Letter of Counsel may be entered into an employee's personnel file. (*Cf. id.* §§ 1-7.2(B),(D) (describing verbal and written reprimands).) "The purpose of counseling is to identify any problem(s) which might adversely affect an employee's performance and to seek solutions for these problems." (*Id.* § 1-7.2(A).)

[22]Although Plaintiff believes that Todd knew about her grievance, she has pointed the Court to no evidence that Todd actually did know about it. There is also some evidence that Swiney may have heard about Plaintiff's grievance by June 2006, but Plaintiff has not pointed to evidence that he knew about it before then.

Services, Plaintiff was responsible for working at the front desk and fielding citizen inquiries.

In April of 2006, Rick and Donna Stallings filed complaints about the service they received from Plaintiff at Desk Services. According to Mr. and Mrs. Stallings, Plaintiff refused to help them when they asked for her assistance with a form and again refused to help them when they returned with more information about the form. (Attach. 1 to D. Stallings Decl., Sept. 12, 2007; Attach. 1 to R. Stallings Decl., Sept. 12, 2007.) Mr. and Mrs. Stallings spoke with Plaintiff's supervisor, Parker, who was able to help them. Mr. and Mrs. Stallings each sent a complaint to the Columbus Police Department, explaining that Plaintiff had twice refused to help them and complaining that Plaintiff was "rude and had a horrible attitude." (Attach. 1 to D. Stallings Decl.)

Plaintiff denies being rude to Mr. and Mrs. Stallings, and she contends that "Mrs. Stallings was the one who had acted extremely rudely toward Plaintiff." (Pl.'s SMF ¶ 10.) Parker investigated the complaints but found "insufficient evidence to clearly prove or disprove the allegations in the complaint." (Ex. 33 to Pl.'s SMF 5.) Plaintiff was not disciplined as a result of the complaints made by Mr. and Mrs. Stallings.

During Parker's investigation of the complaints by Mr. and Mrs. Stallings, another citizen, Tracy Edwards, filed a complaint against Plaintiff. According to Edwards, she and her son went to Desk

26

Services to complain about an attack upon the son by another student at his high school. (Edwards Decl. ¶ 2, Sept. 26, 2007; Attach. 1 to Edwards Decl.) According to Edwards, Plaintiff was rude and refused to help her. (Attach. 1 to Edwards Decl.) At that point, Edwards telephoned the school security officer, who telephoned Swiney. Based on that telephone call, Swiney believed that Plaintiff had been rude and unhelpful to a citizen, and he went to the front desk and directed Plaintiff to take Edwards's report. (Swiney Decl. ¶ 6, Nov. 8, 2007.) Plaintiff did take the report, but Edwards complained that Plaintiff was rude and that she did not take an accurate report of the attack on Edwards's son. (Edwards Decl. ¶ 4; Attach. 1 to Edwards Decl.) Plaintiff contends that Edwards was rude to Plaintiff and that Edwards apologized for her behavior. (Pl.'s Dep. at 318:6-12.)

Todd investigated the complaint.[23] Todd asked Plaintiff to write a statement about the incident, and he reviewed statements by two officers who witnessed the incident. (Ex. 36 to Pl.'s SMF, Letter of Counsel at 1, May 16, 2006.) After reviewing the statements, Todd spoke with Edwards. As a result of his investigation, Todd sustained Edwards' general complaint that she had not received professional

---

[23]There is a dispute about why Todd investigated the complaint instead of Parker. According to Todd, he let Parker begin investigating the complaint but took over when Parker was unable to get Edwards to talk with him. (Todd Decl. ¶ 11, Dec. 27, 2007.) According to Parker, Todd told Parker that he would handle the complaint, and Parker never tried to contact Edwards. (Parker Dep. at 35:13-16, 37:17-21.)

service, although Todd did not sustain Edwards's accusation of rudeness. (Ex. 38 to Pl.'s SMF, Memo from Todd to Swiney at 2, June 14, 2006.) Todd issued Plaintiff a Letter of Counsel, instructing her to take a report if a citizen reasonably requests one and that she must maintain a calm and courteous demeanor when dealing with members of the public. (Ex. 36 to Pl.'s SMF at 1-2.)

At some point after the investigation into the Edwards complaint, Plaintiff was reassigned from Desk Services to Property and Evidence, another division of Support Services. Plaintiff contends that she was treated in a hostile and rude manner, but she points to very little evidence in support of this assertion. For example, Plaintiff contends that Swiney told her she would not last long in Property and Evidence, but the full context of this statement is that Swiney caught Plaintiff doing a Sudoku puzzle at work and said that Plaintiff would not "last long if [she did] those puzzles again." (Pl.'s Dep. at 301:13-18.) Plaintiff also asserts that she had to lift equipment such as shot guns, (*id.* at 297:10-15), though Defendants maintain that Plaintiff's assignment was still light duty.

Plaintiff also contends that she was unfairly criticized for her choice of footwear throughout her assignment in Support Services. Desk Services employees were required to wear business casual dress to work. Plaintiff wore "open-toed shoes" "with no backs" during her pregnancy. (Pl.'s Dep. at 293:8-10.) Swiney received a complaint that Plaintiff had been wearing flip flops to work, and he instructed

28

Todd to handle the matter.  Todd instructed Parker to tell Plaintiff that she should not wear flip flops and that she should only wear professional shoes.[24]  Plaintiff was permitted to wear open-toed slides after she brought in a doctor's note explaining why she needed to wear open shoes.  Plaintiff contends that white women on light duty were allowed to wear flip flops, but Todd asserts that he never actually observed anyone wearing flip flops.  In any event, after the flip flop complaint regarding Plaintiff, all officers were reminded that such casual shoes were not appropriate for the office, and no officers were permitted to wear flip flops.

## X.  Plaintiff's Transfer to the Marshal's Office

Plaintiff's maternity leave began on July 13, 2006.  After her maternity leave, Plaintiff requested a transfer to the Muscogee County Marshal's office.  Plaintiff made this request because she believed she would face retaliation if she continued to work for the police department.  When Plaintiff made the transfer request, she did not know what her assignment in the police department would be upon her return from maternity leave.  (Pl.'s Dep. at 341:20-21.)

Plaintiff contends that City employees continued to retaliate against Plaintiff even after she transferred to the Marshal's

---

[24]Part of the shoe controversy appears to involve the proper characterization of certain types of footwear.  It is not clear that Swiney, Todd and Parker were fluent in the subtleties of the taxonomy of ladies' footwear; one woman's "open-toed slide" is another man's "flip flop."

Office.[25] Plaintiff received a grand jury subpoena that related to her prior undercover assignment, and Plaintiff believed that Desk Services personnel improperly released police reports containing her name to the district attorney. While wearing her Deputy Marshal uniform, Plaintiff went to Desk Services to complain. Columbus police officers Rodney Huling, Mike Griffin and Mike O'Keefe were on duty. According to Defendants, there were a lot of customers in the lobby, and Plaintiff began yelling at the Desk Services officers about revealing her name. Plaintiff denies yelling but admits that her voice "may have been a little bit elevated." (Pl.'s SMF ¶ 102–103.) The Desk Services officers told Plaintiff that they were not involved with the subpoena she received, and they tried to calm her down. After a little while, Plaintiff did calm down and leave. Griffin and the other officers filed a report on the incident.[26] Plaintiff points the Court to no evidence of what impact, if any, the report had on her.

Plaintiff also contends that the City retaliated against her when a City employee "spied on" Plaintiff and told Defendants' outside counsel that Plaintiff had met with her attorney and held a

---

[25]Although the Muscogee County Marshal's Office is separate from the police department, it is still under the umbrella of the Columbus Consolidated Government, a consolidated city-county government.

[26]There is evidence that Todd, who supervised the Desk Services officers, may have suggested that the officers write up a report (Huling Dep. 25:13–17, Dec. 17, 2007), but Griffin testified that the report was his idea. (Griffin Dep. 8:8–20, Dec. 11, 2007.)

press conference while she was on the clock as a Deputy Marshal.[27]
(*See* Ex. 46 to Pl.'s SMF, Letter, Oct. 18, 2006.)  Upon learning of
these accusations, Defendants' outside counsel wrote a letter to
Plaintiff's counsel, suggesting that Plaintiff's counsel remind her
client that she should not be holding press conferences or meeting
with her attorney while on the clock.  (*Id.*)  Plaintiff points the
Court to no evidence of what impact, if any, the letter had on her.

## XI.  Plaintiff's Claims

Plaintiff brings the following claims: (1) Title VII claims
against Columbus for hostile work environment based on sex, disparate
treatment based on race and sex, and retaliation, (Am. Compl. ¶¶ 41-
44); (2) § 1981 claims against Defendants for race discrimination and
retaliation, (Am. Compl. ¶¶ 46-47); (3) § 1983 claim against
Defendants for violation of Plaintiff's First Amendment rights, (Am.
Compl. ¶¶ 59-60); (4) state law claim against Columbus for negligent
retention and supervision, (Am. Compl. ¶¶ 49-53); (5) and state law
claim against Defendants for intentional infliction of emotional
distress, (Am. Compl. ¶¶ 55-57).  Plaintiff also appears to assert a
claim under § 1983 for race discrimination in violation of the Equal
Protection Clause of the Fourteenth Amendment.  (Am. Compl. ¶ 47.)

---

[27]Plaintiff points to no evidence of who told Defendant's outside
counsel about the alleged meeting and press conference, although Plaintiff
believes the assistant City attorney once saw Plaintiff say hello to her
attorney at the City's Government Center.  (Pl.'s Dep. at 384:11-15.)

31

DISCUSSION

## I. **Plaintiff's Title VII Claims**

Plaintiff brings claims under Title VII against Columbus for hostile work environment, disparate treatment and retaliation. Specifically, Plaintiff claims that (1) Horiuchi, Spear and Walton subjected her to a hostile work environment based on her gender, (see Am. Compl. ¶ 29);[28] (2) Plaintiff's undercover working conditions were less favorable than the conditions of similarly situated white and male employees; (3) Plaintiff was transferred from Vice to Patrol in retaliation for her complaint of discrimination; and (4) Plaintiff was subjected to retaliation after her transfer from Vice.

### A. Discriminatory Hostile Work Environment

Plaintiff contends that Horiuchi, Spear and Walton subjected her to a discriminatory hostile work environment based on her sex. Title VII prohibits sexual harassment that constitutes sex discrimination, and "[s]exual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999) (en banc). To prevail, Plaintiff must show that "(1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive to alter the

---

[28]Plaintiff's counsel confirmed during the June 24, 2008 summary judgment hearing that Plaintiff's discriminatory hostile work environment claim is based solely on alleged sexual harassment by her superiors.

32

terms and conditions of her employment and create an abusive working environment; and (5) a basis for holding the employer liable exists." *Reeves v. C.H. Robinson Worldwide, Inc.*, 525 F.3d 1139, 1143 (11th Cir. 2008) (citing *Mendoza*, 195 F.3d at 1245).

As evidence of the alleged hostile work environment, Plaintiff points the Court to evidence that Horiuchi and Spear routinely used profanity in front of her while she was undercover, that they spoke about sex in front of her, (*e.g.*, Pl.'s Dep. at 207:15-23), and that when Plaintiff saw Horiuchi while she was undercover, he was "always on the phone" in front of her, most of the time with his girlfriend to talk about sex.[29] (*Id.* at 68:1-9.) According to Plaintiff, this conduct began in July or August of 2004 and continued until she was transferred out of Vice in January 2006. Plaintiff has also shown that on one occasion on December 2005, Plaintiff believed that the Vice unit handled a prostitution detail inappropriately and that Spear wrongly instructed her to watch a video feed of the incident.

Plaintiff has also shown the Court that Walton made three or four inappropriate comments to her over the course of several months, including Walton's requests in August of 2005 that Plaintiff "sit in [his] lap" and "give [him] some tongue." (Defs.' SMF ¶¶ 84, 89; Pl.'s Dep. at 243:24-244:6.) Plaintiff has also shown that Walton once put his arm around her shoulder.

---

[29]It is unclear how often Horiuchi and Spear talked about sex in Plaintiff's presence, since Plaintiff contends that she was rarely provided with cover during her undercover assignment.

Plaintiff did not complain about the conduct of Horiuchi, Spear and Walton to Hawk or anyone else specified by the Fair Treatment Policy until January 3, 2006.

Columbus contends that it is entitled to the affirmative defense established in *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Under the *Ellerth-Faragher* defense, an employer avoids liability if "(1) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities [the employer] provided." *Baldwin v. Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1303 (11th Cir. 2007) (internal quotation marks omitted). Plaintiff contends that Columbus meets neither requirement. The Court disagrees.

Plaintiff does not appear to dispute that Columbus had a valid anti-discrimination policy prohibiting harassment, and she does not dispute that she was aware of the policy. *Cf. Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (noting that employer is required to show that its sexual harassment policy is effectively published and contains reasonable complaint procedures). However, Plaintiff contends that the policy was insufficient because it did not provide any instruction on how an undercover officer should report sexual harassment when the officer is instructed to keep her identity a secret from other police

34

officers and is told not to enter the police headquarters building. The Court finds that the undercover-specific instructions Plaintiff advocates are unnecessary where, as here, the Columbus policy states that complaints of harassment may be presented to a supervisor other than the alleged harasser, and a supervisor is available to hear such complaints from the undercover officer. It is undisputed that Plaintiff knew that Hawk, her ultimate supervisor in Vice, was aware of her undercover assignment. Plaintiff has pointed the Court to no evidence that Hawk was unavailable to hear her complaints. Though Plaintiff contends that she could not complain to Hawk because she was not permitted to enter the police department headquarters and because she did not have Hawk's cell phone number, it is undisputed that Plaintiff saw Hawk occasionally during her undercover assignment. Furthermore, although Plaintiff did not have Hawk's cell phone number, there is no evidence that she was unable to contact him at the police department to set up a meeting or cell phone conversation with him. For these reasons, the Court declines to find that the City's harassment complaint procedures are insufficient.

Plaintiff also contends that the City's policy was insufficient because once Plaintiff did complain on January 3, 2006, Columbus did not conduct a reasonable investigation or promptly correct the harassment. First, Plaintiff argues that the investigation was not reasonable because Rowe was not an impartial investigator into her grievance. Second, Plaintiff suggests that the penalties imposed as

a result of the investigation were not sufficient to correct the harassment.

In support of the first argument, Plaintiff points out that Rowe has known both Boren and Hawk for more than twenty years and that he considers them both to be his close personal friends.[30] Plaintiff also points to an undated anonymous letter that was apparently sent to members of City Council. The letter asked its recipients to monitor the investigation into Plaintiff's grievance and suggested that it would be more appropriate for an independent agency to investigate the grievance than for Rowe to do so. (Ex. 28 to Pl.'s SMF.) However, Plaintiff has pointed to no evidence suggesting that her grievance, which focused on the acts and omissions of Horiuchi, Spear and Walton, was not properly investigated according to police department procedures.[31] Although the investigation was lengthy and

---

[30]Plaintiff also suggests that members of the OOPS team were biased against sexual harassment claims. In support of this argument, Plaintiff points the Court only to evidence that two OOPS team members were accused (or were *rumored* to have been accused) of sexual harassment. First, Plaintiff asserts that a rumor once circulated that Rowe had sexually harassed his secretary. (Rowe Dep. 78:8-80:14, Dec. 14, 2007.) However, there was never any complaint regarding this matter, and the Court cannot find that this unsubstantiated rumor, by itself, creates a genuine issue of material fact that Rowe was biased with regard to claims of sexual harassment. Plaintiff also points out that R.L. Garrett, an OOPS investigator who worked on the investigation into Plaintiff's grievance, had been accused of sexual harassment, though the complaint was investigated and determined to be unfounded. The Court declines to find that simply being accused of sexual harassment, standing alone, should have precluded Garrett from investigating Plaintiff's grievance.

[31]Plaintiff contends that the OOPS investigators overlooked "documentary evidence" that Plaintiff was not being provided with cover and operational funds. (*E.g.*, Pl.'s SMF ¶ 97.) This evidence consists of the few operational funds voucher records that were actually maintained by the Vice unit with regard to Plaintiff's undercover activities. The OOPS

ultimately took months to complete, the evidence shows that the OOPS team conducted extensive interviews, reviewed extensive records and spent considerable time "in an effort to arrive at a reasonably fair estimate of truth." *Baldwin*, 480 F.3d at 1304. Accordingly, the Court finds that the investigation was reasonable given the circumstances*. See Baldwin*, 480 F.3d at 1303, 1304 (noting that an investigation must be reasonable under the circumstances to satisfy *Ellerth-Faragher*).

Even if there were shortcomings in the investigation, the *Ellerth-Faragher* defense is still available if the remedial result is adequate. *Baldwin*, 480 F.3d at 1305. Plaintiff contends, however, that the remedial measures were not sufficient to fix the problems. Specifically, Plaintiff suggests that the punishments meted out to Walton and Horiuchi, the two main alleged harassers,[32] were not sufficient. The Court disagrees. Although Walton was exonerated of sexual harassment,[33] he was punished for failing to maintain a proper supervisor/subordinate relationship with Plaintiff and for making

---

investigators did not overlook this evidence; they concluded that there were egregious record-keeping problems in Vice that made it difficult for them to determine the nature and scope of the undercover operation, including when Plaintiff actually worked on her undercover assignments. (*E.g.*, Attach. 2 to Boren Decl.)

[32]The investigation also cleared Spear of harassment. As discussed *infra* note 35, the Court finds that to the extent Spear is accused of harassment, Plaintiff has not pointed to sufficient evidence to show that his conduct was actionable sexual harassment.

[33]As discussed *infra* note 35, Walton's alleged harassment of Plaintiff was not severe or pervasive enough to be actionable under Title VII.

inappropriate comments to Plaintiff. Walton was suspended for three days without pay, he was transferred out of Vice, and he was required to attend sexual harassment training.  Since warning and counseling alone are typically accepted as first-step corrective measures for harassment, *see id.* at 1305, the Court cannot conclude that Walton's punishment, which far exceeded a simple warning, was an insufficient remedy.  Although the investigation concluded that Horiuchi had not sexually harassed Plaintiff,[34] Horiuchi was reprimanded for his lack of professionalism with Plaintiff, was instructed to review the City's sexual harassment policy, and was transferred out of Vice. For these reasons, the Court finds that the City took appropriate corrective measures in response to Plaintiff's grievance.

Having found that Defendants met the first prong of the *Ellerth-Faragher* defense, the Court now turns to the second element: Defendants must show that Plaintiff "unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Baldwin*, 480 F.3d at 1306 (internal quotation marks omitted).  The evidence shows that the alleged harassment by Horiuchi and, to a lesser extent, Spear, consisting of profanity and sexually explicit discussions, began in July or August of 2004.  The evidence shows that the alleged harassment by Walton began in at least August of 2005.  Plaintiff did

---

[34]As discussed *infra* note 35, the alleged harassment by Horiuchi was not severe or pervasive enough to be actionable under Title VII.

not complain about any of the alleged harassment to Hawk or any other person named in the City's Fair Treatment Policy until January of 2006. Her delay—more than a year after the alleged harassment by Horiuchi and Spear began and at least four months after the alleged harassment by Walton began—is too long. *See id.* at 1307 (reporting delay of three and a half months after first incidents of harassment was too long); *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1289-91 (11th Cir. 2003) (per curiam) (two and a half month reporting delay after first incidents of harassment was too long). Furthermore, although Plaintiff contends that she did not have a way to voice her complaints given her undercover status, the evidence, discussed above, shows that Hawk was an available avenue for Plaintiff's complaints, but Plaintiff did not complain to him. For these reasons, the Court finds that Plaintiff unreasonably failed in her duty to assist in the prevention of harassment by promptly reporting it to her employer. Accordingly, Columbus is entitled to the *Ellerth-Faragher* affirmative defense on Plaintiff's sexual harassment claim, and the Court grants the City's motion for summary judgment on this claim.[35]

---

[35]Even if Columbus were not entitled to the affirmative defense, it would still be entitled to summary judgment on Plaintiff's sexual harassment claim because Plaintiff has not pointed the Court to sufficient evidence that the alleged harassment was objectively severe or pervasive. Regarding the alleged harassment by Walton, Plaintiff points the Court to four or five inappropriate but nonthreatening comments over at least a four month period and one instance where Walton put his arm around Plaintiff's shoulder. The Court cannot find that this conduct meets the "severe or pervasive" requirement. *See Mendoza*, 195 F.3d at 1246 (listing factors to be considered in determining whether "severe or pervasive" element is met:

B.  Discriminatory Undercover Working Conditions

Plaintiff contends that she was subjected to disparate treatment based on her race and sex during her undercover assignment. Plaintiff has no direct evidence of discrimination, so the Court will employ the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008). Plaintiff has the burden to make a prima facie case of discrimination, and she may do so by showing that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated employees outside her protected class more favorably, and (4) she was qualified to do the job. *Id.* Defendants do not dispute that Plaintiff is a member of a protected class or that she was

---

(1) frequency, (2) severity, (3) whether conduct is physically threatening or humiliating, and (4) whether conduct unreasonably interferes with the employee's job performance).

Regarding the alleged harassment by Horiuchi and Spear, the evidence shows that they engaged in sexually explicit conversations in front of Plaintiff but (1) did not direct the conduct at Plaintiff, (2) were not physically threatening or humiliating, and (3) did not unreasonably interfere with Plaintiff's job performance. *See Mendoza*, 195 F.3d at 1246-47; *cf. Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276-77 (11th Cir. 2002) (finding objectively severe or pervasive environment where supervisor "hurled . . . ethnic slurs" at the plaintiff three or four times a day, often in the course of reprimanding the plaintiff, and interfered with the plaintiff's job performance). This does not meet the "severe or pervasive" requirement. *Mendoza*, 195 F.3d at 1246-47. Also, the record suggests that Horiuchi and Spear were "equal opportunity cursers," so their prevalent use of profanity is not an adequate basis for Plaintiff's claim because Plaintiff has not established that it was "based on" her sex. *See Baldwin*, 480 F.3d at 1302 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *cf. Reeves*, 525 F.3d at 1145 (finding that offensive language may be considered "based on" sex if the Plaintiff can show that it is more degrading to women than men).

qualified to do the undercover assignment. As discussed above, there is a genuine issue of material fact as to whether Defendants sent Plaintiff to do undercover work in potentially dangerous nightclubs without cover, contrary to police department policy.[36] (*See* Pl.'s Dep. at 139:15-21, 155:8-13.) There is also a genuine issue of material fact as to whether Defendants required Plaintiff to use her own money to fund her undercover assignment, even though there is no question that she should have been given police department funds for her work. (*See id.* at 133:10-19; 144:7-9.) There is also evidence that the provision of operational funds was tied to the provision of cover; if Plaintiff was sent out to a club by herself, she would not receive any operational funds. (*E.g.*, *id.* at 79:14-16.)

It is not seriously disputed that the practice of sending Plaintiff into potentially dangerous clubs without proper precautions or operational funds constitutes an adverse employment action. *See Van Voorhis v. Hillsborough County Bd. of County Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) ("An adverse employment action is . . . conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her

---

[36]Indeed, Spear and Horiuchi appear to recognize the importance of providing cover because they both contend that they *did* always provide Plaintiff with cover. (Horiuchi Decl. ¶ 6, Dec. 3, 2007; Spear Decl. ¶¶ 5, 19, 20.) Department policy requires that undercover officers receive cover. (*See, e.g.,* Hawk Decl. ¶ 3 (noting that department policy required two agents providing cover for an undercover officer); Robertson Decl. ¶ 5, Aug. 20, 2007 (noting that, in general, when an undercover officer went inside a club "other officers were always stationed at a close distance outside of the club so that they could quickly provide assistance if the undercover agent signaled for help").)

of employment opportunities, or adversely affects his or her status as an employee." (internal quotation marks omitted)). The question remaining is whether Defendants failed to provide Plaintiff with cover and operational funds for Plaintiff *because of* her race and/or sex. Plaintiff may establish this element by showing that Defendants treated similarly situated white or male employees differently.

Defendants contend that male police officers were treated the same as Plaintiff and worked as undercover operatives without a cover team or a wire. (*See, e.g.,* Tuning Decl. ¶ 4.) However, Plaintiff points to evidence that some male and white female undercover operatives—who worked under the same departmental policies and with some of the same team members as Plaintiff did—were treated differently than she was: they were never sent on an undercover assignment without cover. For example, white female police officers Brooke Shasby and Wendy Holland worked undercover in clubs without a wire, but never without a cover team outside and close telephone contact. (Holland Decl. ¶ 4, Sept. 13, 2007; Shasby Decl. ¶¶ 4-6, Aug. 7, 2007; *see also* Defs.' SMF ¶¶ 45-46 (noting that cover teams for Shasby and Holland were always stationed outside).) Both Holland and Shasby worked with Spear and/or Walton. In addition, Roderick Winston, a black male police officer, testified that he never worked as an undercover officer without cover. (Winston Dep. 17:8-10, Nov. 27, 2007.) Accordingly, the Court finds that Plaintiff has met her burden of showing that male and white female undercover officers were

42

treated differently than she was in terms of being provided with cover and operational funds.[37]

Because Plaintiff met her burden of establishing a prima facie case of discrimination based on race and sex, the burden shifts to the City to articulate a legitimate nondiscriminatory reason for its actions. *See, e.g., Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007). The City has articulated no legitimate nondiscriminatory reason for sending Plaintiff on undercover assignments to nightclubs with no cover or operational funds. Rather, the City simply argues that Plaintiff was not subjected to the working conditions she says she was: according to Defendants, Plaintiff was always provided with cover and operational funds. As discussed above, there are genuine issues of material fact as to whether Plaintiff was subjected to unfavorable undercover working conditions based on her race and sex. Because the City has articulated no legitimate nondiscriminatory reason for its actions, the Court finds that the City is not entitled to summary judgment on Plaintiff's Title VII claims based on her undercover working conditions.[38]

---

[37]Although Plaintiff has pointed to no specific evidence that white or male undercover officers were always provided with operational funds while she was not, she has pointed to evidence that the provision of operational funds was tied to the provision of cover.

[38]Defendants contend that Plaintiff's discriminatory undercover working conditions claim is barred because she did not file an EEOC charge within 180 days "after the alleged unlawful employment practice occurred." Defendants contend that if Plaintiff had been subjected to discriminatory working conditions, those conditions began in July of 2004, so her EEOC

43

C.  Retaliation Claims

Title VII prohibits retaliation against an employee because she has opposed an unlawful employment practice or because she has participated in an investigation, proceeding or hearing under Title VII.  42 U.S.C. § 2000e-3(a).  To make a prima facie case of retaliation, Plaintiff must show that (1) she engaged in activity protected under Title VII, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action.  *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).  In the retaliation context, an "adverse employment action" is one that a reasonable employee would find "materially adverse," which means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  While Title VII

charge in January of 2006 is too late.  Defendants liken this case to *Ledbetter v. Goodyear Tire & Rubber Co.*, __ U.S. __, 127 S. Ct. 2162 (2007), where the Plaintiff complained that her paychecks issued during the EEOC charging period were too low based on discriminatory acts that took place before the charging period.  *Id*. at 2167, 2169.  That case has no application here, where Defendants made a discriminatory decision each time they chose to send Plaintiff on undercover assignments without cover during the EEOC charging period.  *Id*. at 2169 ("[I]f an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.")  It is unnecessary for the Court to decide whether Plaintiff's unverified letter, which was received by the EEOC on January 12, 2006, constitutes an acceptable EEOC charge because Plaintiff has pointed to evidence that she was subjected to unfavorable working conditions within 180 days of the EEOC's receipt on January 30, 2006 of her verified charge of discrimination: Plaintiff shows that she was sent out to clubs without cover and that she was not provided with operational funds "throughout 2005," including on or after August 3, 2005.

44

does not "immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience[,]" it does prohibit actions "that are likely to deter victims of discrimination from complaining to the EEOC, the courts, and their employers." *Id.* (internal quotation marks omitted); *see also Carroll*, 529 F.3d at 974 (finding that unfavorable performance review that affected employee's eligibility for merit pay increase was materially adverse).

Plaintiff claims that Defendants retaliated against her for making the grievance. Defendants do not contest that Plaintiff's grievance constitutes protected activity, but they do claim that the alleged retaliatory acts were not materially adverse and/or were not causally related to Plaintiff's protected activity. Plaintiff claims that the following acts were retaliatory: (1) transfer of Plaintiff from Vice to Patrol; (2) Letter of Counsel regarding the December 30, 2005 briefing; (3) heightened scrutiny by Support Services supervisors; (4) report by Desk Services officers regarding Plaintiff's alleged outburst in October of 2006; and (5) alleged "spying" on Plaintiff by the City attorney's office. Each of these issues is addressed in turn below.

### 1. *Retaliatory Transfer from Vice to Patrol*

Plaintiff contends that she was transferred from Vice to the Patrol Division in retaliation for her complaints about discrimination and harassment. Defendants contend that the transfer

from Vice to Patrol was not a materially adverse action and that the transfer was not because of Plaintiff's protected activity. The Court disagrees. Plaintiff has pointed the Court to evidence that an assignment to Vice is a more desirable position than Patrol in terms of eligibility for promotion: Vice is considered a "fast track" to detective. (*E.g.*, Hawk Dep. at 30:3-6.) Therefore, the Court finds that the transfer from Vice to Patrol is a materially adverse action. *Cf. Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005) ("[A] transfer to a less desirable position in terms of pay or eligibility for pay increases is an adverse employment action because it is equivalent to a demotion."). In addition, a "close temporal proximity may be sufficient to show that the protected activity and the adverse action are not wholly unrelated." *McCann*, 526 F.3d at 1376 (internal quotation marks omitted). Boren transferred Plaintiff to Patrol one day after she filed her grievance, so the Court finds that Plaintiff has satisfied the "close temporal proximity" test of the causation element. *Id.* For these reasons, Plaintiff has met her burden of making out a prima facie case of retaliation.

Defendants articulated two nonretaliatory reasons for Plaintiff's transfer. First, Defendants contend that Plaintiff was not qualified for a permanent position in Vice. However, Plaintiff has pointed the Court to evidence that Defendants planned to keep Plaintiff in Vice permanently despite the usual requirements and that, but for the grievance, Plaintiff would have remained in Vice.

46

(*E.g.* Hickey Dep. at 49:12-20; Pl.'s Dep. at 198:18-25; Hawk Dep. 32:8-12.)  For this reason, the Court finds that genuine issues of material fact exist as to whether Defendants' first articulated reason for the transfer is pretextual.  Second, Defendants contend that Boren transferred Plaintiff to prevent Plaintiff from being subjected to further harassment.  (Boren Decl. ¶¶ 7-8.)  This articulated reason suggests that Plaintiff *was* transferred because of her grievance.  Furthermore, under Defendants' argument, any time an employee complained of discrimination, it would be permissible to transfer the person who complained to an undesirable assignment while investigating the complaint.  Such a practice would defeat the purpose of Title VII's prohibition against retaliation.  For these reasons, the Court finds that genuine issues of material fact exist as to whether Defendants' second articulated reason for the transfer is pretextual.  Accordingly, the Court denies the City's summary judgment motion as to Plaintiff's Title VII claims based on the transfer from Vice to Patrol.

> 2.   *Letter of Counsel Regarding December 2005 Briefing*

With regard to the September 2006 Letter of Counsel from Boren, the Court notes that the letter was a direct response to Plaintiff's grievance, so it would be reasonable for a jury to conclude that the Letter of Counsel was "because of" Plaintiff's grievance.  A reasonable jury could also conclude that the Letter of Counsel is a materially adverse action and not just a "petty slight" or "minor

annoyance": the Letter of Counsel is a disciplinary action under the Columbus police department's discipline scheme, and such a letter may be entered into the employee's personnel file. *See Burlington N.*, 548 U.S. at 68 (noting that a materially adverse action is one that might deter a reasonable employee from complaining of discrimination). For these reasons, the Court finds that Plaintiff has made out a prima facie case of retaliation regarding the September 2006 Letter of Counsel.

Defendants contend that there is a legitimate nonretaliatory reason for the Letter of Counsel: the investigation into Plaintiff's grievance also uncovered evidence that Plaintiff had been insubordinate in the December 30, 2005 briefing. Although there is certainly evidence to support this articulated reason, (*e.g.*, Ex. 16 to Pl.'s SMF, Josey Interview at 9-10, Jan. 18, 2006), there is evidence Boren discounted evidence that Plaintiff was not insubordinate, (*e.g.,* Ex. 13 to Pl.'s SMF, Pl.'s Interview at 32-35, Jan. 4, 2006; Ex. 18 to Pl.'s SMF, Grant Interview at 6-7, Jan. 11, 2006.) In addition, Plaintiff points out that she was never told that she had been accused of insubordination and was therefore not able to answer the charge. Plaintiff also notes that Defendants lost or destroyed potentially exculpatory statements that Vice agents drafted for Hawk regarding the December 30, 2005 briefing. For these reasons, the Court finds that there is sufficient evidence for a jury to find that the articulated reasons for the Letter of Counsel are

pretextual. The City is not entitled to summary judgment on this claim.

### 3. *Hostile Work Environment in Support Services*

Plaintiff asserts that her Support Services supervisors subjected her to unfair scrutiny because of her complaints of discrimination: Plaintiff claims that (1) in late April 2006 two citizen complaints were filed against Plaintiff and one of them resulted in a Letter of Counsel;[39] (2) she was transferred from a light-duty position in Desk Services to a light-duty position in Property and Evidence; and (3) Todd and Swiney unfairly criticized her choice of footwear during her Support Services assignment.

The Court finds, however, that Plaintiff has not met her burden of showing that she was subjected to a retaliatory hostile work environment *because of* her protected activity. To establish a causal connection, Plaintiff must show that the decision-makers, in this instance Todd and Swiney, were aware of the protected conduct and that the protected conduct and the adverse action were not wholly unrelated. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) (abrogated on other grounds in *Burlington N.*, 548 U.S. at 68). Though Plaintiff believes that "everyone" knew about her grievance and EEOC charge, she has pointed to no evidence that Todd

---

[39]Plaintiff appears to suggest that Todd and Swiney manufactured the citizen complaints. However, she points to no evidence to support this suggestion. Furthermore, all three citizens provided affidavits explaining their complaints about Plaintiff.

and Swiney knew about them at the time of the alleged retaliatory acts. Furthermore, even if Plaintiff *had* shown that Todd or Swiney knew of her protected activity, she has not pointed the Court to evidence that the alleged retaliatory acts are not wholly unrelated to the protected activity. Rather, Plaintiff appears to rely solely on the temporal proximity between the protected activity and the alleged retaliatory acts, but she has also not shown the requisite "very close" temporal proximity. Plaintiff filed her grievance at the beginning of January 2006, and she filed her EEOC charge at the end of January 2006. The alleged retaliatory acts did not take place until nearly four months after Plaintiff's grievance and three months after Plaintiff's EEOC charge. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (noting that temporal proximity between protected activity and retaliation must be "very close"). Therefore, Plaintiff has not established the requisite causal connection between the alleged retaliation by Swiney and Todd and the protected activity. Accordingly, the City is entitled to summary judgment on this claim.[40]

---

[40]For the same reasons, the City, Todd and Swiney are entitled to summary judgment as to Plaintiff's § 1981 claims regarding retaliation in Support Services. *See Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1347 n.1 (11th Cir. 2007) (per curiam) ("Both Title VII and § 1981 have the same requirements of proof and present the same analytical framework.").

## 4.   October 2006 Desk Services Report

With regard to the October 2006 report by Officers Huling, Griffin and O'Keefe regarding Plaintiff's alleged outburst in Desk Services, Plaintiff has pointed the Court to no evidence that any of the officers knew of her protected activity.  Even if the officers knew of the protected activity, there is no "very close" temporal proximity between the protected activity and the report.  Finally, Plaintiff has pointed to no evidence regarding what effect, if any, the report had upon her, so even if she could establish causation the Court would have difficulty finding that the report constituted a materially adverse action.  *Cf. Cain v. Green*, 261 F. App'x 215, 217 (11th Cir. 2008) (per curiam) (performance review giving employee second highest rating instead of highest rating was not a materially adverse action because it had no impact on employee's employment).  Therefore, the City is entitled to summary judgment as to Plaintiff's Title VII and § 1981 claims based on the October 2006 report.

## 5.   October 2006 *"Spying" by City Attorney*

Finally, Plaintiff contends that the assistant City attorney "spied" on her and that this spying resulted in an October 2006 letter from Defendants' outside counsel to Plaintiff's counsel.  The letter suggests that a City employee may have seen Plaintiff speaking with her attorney or holding a press conference while at work,[41] and

---

[41]The Court notes that the Marshal's Office and other City offices are all in one government center complex.

it politely reminds Plaintiff and her counsel that Plaintiff should not pursue her claims while she is "on the clock" and also asks Plaintiff's counsel to set up her meetings with Plaintiff someplace other than Plaintiff's place of employment. Plaintiff testified that any allegations that she met with her lawyer or held press conferences on City time are false, though she also contends that such allegations show that the City attorney placed her under surveillance. (Pl.'s Dep. at 384:2-5.)

The Court finds that the letter does not amount to actionable retaliation. While the letter is in response to alleged litigation-related activities, there is no evidence of any adverse impact as a result of the letter. There is also no evidence of whose report, if any, prompted the letter. There is no evidence of any surveillance of Plaintiff—at most, Plaintiff points to evidence that the assistant City attorney once saw Plaintiff speaking with her attorney at the City's Government Center, though Plaintiff contends she was just saying hello. (Pl.'s Dep. at 384:11-15.) Certainly Plaintiff is not permitted to engage in non-work-related pursuits, such as her lawsuit against the City, while she is on the clock, and the letter does nothing more than remind her of that. Accordingly, the City is entitled to summary judgment as to Plaintiff's Title VII and § 1981 claims based on the October 2006 letter.

### D. Transfer from Police Department to Marshal's Office

To the extent that Plaintiff claims her voluntary transfer to the Muscogee County Marshal's Office is actionable, the Court finds that it is not. Plaintiff contends that she requested the transfer because she feared that she would be subjected to retaliation if she continued to work in the Columbus police department after her maternity leave. However, Plaintiff's subjective fears of reprisal were not reasonable, particularly given that she did not even know what her assignment would be when she returned from maternity leave. Furthermore, Plaintiff has pointed to no evidence that her working conditions were "so intolerable that a reasonable person in [her] position would have been compelled to resign." *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003) (internal quotation marks omitted) (defining standard for constructive discharge). Accordingly, the City is entitled to summary judgment on any claim based upon Plaintiff's voluntary transfer to the Marshal's Office.

## II. Plaintiff's § 1981 and Equal Protection Claims

As discussed above, Plaintiff's Title VII claims based on her undercover working conditions, the transfer from Vice to Patrol, and the Letter of Counsel regarding the December 30, 2005 briefing survive summary judgment. Plaintiff also asserts § 1981 and equal protection claims for race discrimination and retaliation against the

City and individual defendants based on the same conduct.[42]  *See Springer*, 509 F.3d at 1347 n.1 ("Both Title VII and § 1981 have the same requirements of proof and present the same analytical framework.").

A.  § 1981 and Equal Protection Claims against the City

Plaintiff brings her § 1981 and equal protection claims against the City under § 1983.  *See Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1273 n.3 (11th Cir. 2008) ("Section 1983 constitutes the exclusive remedy against state actors for violations of the rights contained in § 1981." (internal quotation marks omitted)).  Section 1983 provides a constraint on claims against governmental entities: the discrimination complained of must be "a custom or policy of the governmental entity." *Webster v. Fulton County, Ga.*, 283 F.3d 1254, 1257 n.8 (11th Cir. 2002); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (plurality opinion); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  A "policy" is a decision officially adopted by a municipality or  "created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005) (internal quotation marks omitted).  A "custom is a practice that is so settled and permanent that it takes on the force of law."

---

[42]Plaintiff may not recover for retaliation under an equal protection theory. *E.g., Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 341 (11th Cir. 1995).  Defendants are therefore entitled to summary judgment on any retaliation claims based upon a denial of equal protection.

*Id.* (internal quotation marks omitted). Only an official with "final policymaking authority may render the municipality liable under § 1983." *Id.* (internal quotation marks omitted). Under appropriate circumstances, municipal liability may be imposed for a single decision by a final policymaker. *Id.* (citing *Pembaur*, 475 U.S. at 480).

The question whether an official has final policymaking authority on a particular issue is a question of law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). State and local law "determine whether a particular official has final policymaker authority for § 1983 purposes." *Cooper*, 403 F.3d at 1221. The question here is whether Boren is the City's final policymaker with regard to Columbus police department employment decisions *or*, if he is not, whether the final policymaker ratified Boren's decision. *Cf. Matthews v. Columbia County*, 294 F.3d 1294, 1297 (11th Cir. 2002) (per curiam) (discussing ratification theory of municipal liability). The parties have pointed the Court to no authority on either side of this issue. Based upon the present record, the Court finds that at a minimum genuine issues of material fact exist as to whether Boren is the final policymaker for Columbus with regard to police department employment decisions. Therefore, summary judgment is not appropriate as to Plaintiff's discrimination claims against the City based upon Boren's employment decisions.

With regard to Plaintiff's claims based on her undercover working conditions, the Court concludes that Plaintiff has pointed to no evidence suggesting a policy or custom of discriminatory working conditions that may be attributed to the City. Although she has pointed to evidence suggesting that three police officers—Horiuchi, Walton, and Spear—subjected her to unfavorable undercover working conditions based on her race, she has pointed to no evidence that there was any custom or practice "so settled and permanent that it [took] on the force of law," *Cooper*, 403 F.3d at 1221, no decision by a final policymaker with authority to make such a decision, and no evidence that would support liability based on a theory of ratification. Accordingly, municipal liability is not appropriate. For these reasons, the City is entitled to summary judgment on Plaintiff's § 1981 and equal protection claims based on her undercover working conditions.

Turning to Plaintiff's § 1981 retaliation claims based on Plaintiff's transfer from Vice to Patrol and the Letter of Counsel from Boren, the Court finds that these claims may proceed against the City. Section 1981 "encompasses claims of retaliation." *CBOCS West, Inc. v. Humphries*, __ U.S. __, 128 S. Ct. 1951, 1961 (2008). Both allegedly retaliatory actions were taken by Boren, whom the Court finds for summary judgment purposes is the final policymaker for the City with regard to police department employment decisions such as transfers and discipline. A single decision by a final policymaker

may constitute a "policy" such that municipal liability attaches where, as here, the final policymaker made a "'deliberate choice to follow a course of action . . . made from various alternatives.'" *Cooper*, 403 F.3d at 1223 (quoting *Pembaur*, 475 U.S. at 483) (omission in original). For these reasons, the Court denies the City's motion for summary judgment as to these § 1981 retaliation claims.

B.  <u>§ 1981 and Equal Protection Claims Against Individual Defendants</u>

Plaintiff also brings § 1981 and equal protection claims against the Defendants in their individual capacities. Specifically, she brings claims against Horiuchi, Spear and Walton based on her undercover working conditions.[43]  She also brings § 1981 claims against Boren based on the transfer from Vice to Patrol and the Letter of Counsel regarding the December 30, 2005 briefing. Defendants contend that they are entitled to qualified immunity for their actions.

Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as

---

[43]Plaintiff points the Court to no evidence that Hawk or Boren personally participated in creating the discriminatory working conditions or knew of the alleged discriminatory working conditions but failed to stop them, so their conduct does not give rise to § 1981 or § 1983 liability. To the extent that Plaintiff seeks to assert § 1981 and § 1983 claims against Hawk or Boren based on a respondeat superior theory, the Court finds that such claims are inappropriate. Supervisory liability under § 1983 must be based on something more than respondeat superior. *Carroll*, 529 F.3d at 978. In addition, liability under § 1981 requires a showing of intentional discrimination, which is incompatible with respondeat superior principles. *E.g., Daniels v. Dillard's, Inc.*, 373 F.3d 885, 888 n.4 (8th Cir. 2004).

their acts do not violate clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)). To receive qualified immunity, an officer must show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Id.* Here, Plaintiff does not dispute that the individual defendants were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred.

After a defendant establishes that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. In determining whether qualified immunity is appropriate, the courts apply a two-part test. First, the court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a statutory or constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Rioux*, 520 F.3d at 1282. If no right would have been violated under the plaintiff's version of the facts, there is no

need for further inquiry.  *Lee*, 284 F.3d at 1194.  If, however, the plaintiff's version of the facts establishes a violation of a right, the court must then determine whether the right was clearly established at the time of the officer's conduct.  *Saucier*, 533 U.S. at 201.  A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Hope*, 536 U.S. at 739.  The unlawfulness of the action must be apparent in light of pre-existing law, but there is no requirement that the very action in question has been previously held unlawful.  *Id.*

Section 1981 ensures the right to be free from intentional racial discrimination in the making and enforcing of contracts, including employment contracts, and the Equal Protection Clause ensures a right to be free from intentional discrimination based upon race.  Here, as discussed above, Plaintiff's claims, if believed, would establish that Horiuchi, Spear and Walton intentionally discriminated against Plaintiff because of her race and that Boren intentionally retaliated against Plaintiff for her complaints of racial discrimination.[44]  At the time of the events giving rise to this lawsuit, it was clearly established that such discrimination and retaliation was unlawful.  *See, e.g., Jones v. R.R. Donnelley & Sons*

---

[44]Again, Plaintiff may not recover for retaliation under an equal protection theory.  *E.g., Ratliff v. DeKalb County, Ga.*, 62 F.3d 338, 340-41 (11th Cir. 1995).  Boren is therefore entitled to summary judgment on any retaliation claims based upon a denial of equal protection.

*Co.*, 541 U.S. 369, 383 (2004) (noting, in May 2004, that 1991 amendment to § 1981 provides a cause of action for racial discrimination relating to the conditions of employment); *Williams v. Consol. City of Jacksonville*, 341 F.3d 1261, 1268, 1272 (11th Cir. 2003) (recognizing equal protection right to be free from employment discrimination); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998) (recognizing retaliation claims under § 1981). Accordingly, Boren, Horiuchi, Spear and Walton are not entitled to qualified immunity, and Defendants' motion for summary judgment is denied.

## III. Plaintiff's First Amendment Claims

In addition to her employment discrimination claims, Plaintiff contends that Defendants retaliated against her for making a complaint of discrimination and retaliation, thereby violating her First Amendment right to exercise free speech.[45] "[F]or a government employee's speech to have First Amendment protection, the employee must have (1) spoken as a citizen and (2) addressed matters of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1341 (11th Cir. 2007) (per curiam). This is because "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, . . . a federal court is not

---

[45]As discussed below, the Court finds no First Amendment violation. Therefore, Boren is entitled to qualified immunity, *see Saucier*, 533 U.S. at 201, and the Court need not analyze whether the retaliation complained of is a policy or custom of the City such that Plaintiff's claim may be asserted pursuant to § 1983, *see Monell*, 436 U.S. at 694-95.

the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency . . . ." *Connick v. Myers*, 461 U.S. 138, 147 (1983). Furthermore, "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). In other words, if the government employee is "speaking as an employee, there can be no First Amendment issue, and the constitutional inquiry ends[.]" *Boyce*, 510 F.3d at 1343. Thus, the Court must determine whether Plaintiff "spoke on behalf of the public as a citizen" or "spoke for herself as an employee." *Id.* (internal quotation marks omitted).

Plaintiff contends that she was speaking as a citizen on a matter of public concern when she filed her grievance and EEOC charges. Specifically, she contends that she complained on behalf of "other black female officers" who might be subjected to the same working conditions she was. (Pl.'s Resp. Br. to Mot. for Summ. J. 19 [hereinafter Pl.'s Resp.].) However, Plaintiff's grievance letter and EEOC charges contain virtually no reference to anything other than Plaintiff's personal job problems; even a generous reading does not reveal a complaint on behalf of "other black female officers," as Plaintiff suggests in her brief. Rather, the grievance and the EEOC charges focus nearly exclusively on subjects personal to Plaintiff's

61

working conditions. *See Boyce*, 510 F.3d at 1344 (finding that workers' complaints about workload were primarily complaints about their jobs and not complaints about the employer's ability to fulfill its mission). Plaintiff submitted her grievance in accordance with her responsibility to do so under the City's Fair Treatment Policy. (*See* Fair Treatment Policy.) Furthermore, Plaintiff testified that she considered it part of her job duties as a law enforcement officer to report what she believed to be discrimination against her. (Pl.'s Dep. at 382:16-25.)

Based on all of this, the Court finds that Plaintiff's speech addressed personal grievances and frustrations with her job as a police officer. While Plaintiff's grievances may arguably be intermingled with broader concerns regarding discrimination in the police department, they were "not intended to address matters of public concern from the perspective of a citizen." *Boyce*, 510 F.3d at 1345; *see also id.* at 1344 ("A public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." (Internal quotation marks omitted)). Rather, Plaintiff spoke primarily as an employee to improve her work environment. Accordingly, the Court finds that she has "no First Amendment cause of action based on . . . her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418. Therefore, Defendants are entitled to summary judgment on this claim.

## IV.  Plaintiff's State Law Claims

In addition to her federal law claims, Plaintiff brings claims under Georgia law against the City for negligent retention and supervision and against the City and individual defendants for intentional infliction of emotional distress.  Defendants assert that they are entitled to immunity on these claims.

The City is entitled to summary judgment as to all of Plaintiff's state law claims because it is entitled to sovereign immunity.  The doctrine of sovereign immunity protects governments, including counties,[46] from suit unless they have waived their immunity.  *Williams v. Whitfield County*, 289 Ga. App. 301, 302-03, 656 S.E.2d 584, 586 (2008).  A county's sovereign immunity "may only be waived by a legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver."  *Id.* at 302, 656 S.E.2d at 586.  Here, Plaintiff has not established any waiver of immunity by the City, and the City is therefore entitled to summary judgment on Plaintiff's state law claims.  *See Doss*, 290 Ga. App. at 675-76, 660 S.E.2d at 462 (finding city was entitled to sovereign immunity on plaintiff's negligent retention, hiring and

---

[46]The City is a consolidated city-county government, and the Court views the City as a county for purposes of the sovereign immunity inquiry. The Court notes that as a practical matter, it is immaterial whether the City is a city or county because cities are entitled to sovereign immunity under Georgia law, as well.  *See Doss v. City of Savannah*, 290 Ga. App. 670, 675-76, 660 S.E.2d 457, 462 (2008) (finding that city was entitled to sovereign immunity on plaintiff's negligent retention, hiring and supervision claim).

supervision claim because plaintiff had not established any waiver of immunity); *cf. Richardson v. Dougherty County, Ga.*, 185 F. App'x 785, 791 (11th Cir. 2006) (affirming grant of immunity to county on employee's state law claims against his former employer).

Turning to Plaintiff's claims against the individual Defendants, a suit against a governmental employee sued in his individual capacity "is barred by official immunity where the public official has engaged in discretionary acts that are within the scope of his or her authority, and the official has not acted in a wilful or wanton manner; with actual malice; or with the actual intent to cause injury." *Brown v. Penland Const. Co., Inc.*, 281 Ga. 625, 625-26, 641 S.E.2d 522, 523 (2007). Plaintiff does not seriously dispute that the individual defendants were engaging in discretionary acts when they made the employment decisions giving rise to this case. *Cf. Doss*, 290 Ga. App. at 675, 660 S.E.2d at 462 (finding that employment decisions are types of discretionary functions).

The next question is whether Defendants acted in a wilful or wanton manner, with actual malice, or actual intent to cause injury. "Actual malice" means "a deliberate intention to do wrong, and does not include 'implied malice,' i.e., the reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 282 Ga. 197, 203, 647 S.E.2d 54, 60 (2007). A "deliberate intention to do wrong" is "the intent to cause the harm suffered by the plaintiffs." *Id.* Similarly, "actual intent to cause injury" means "an actual intent to

cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Kidd v. Coates*, 271 Ga. 33, 33, 518 S.E.2d 124, 125 (1999) (internal quotation marks omitted). Here, Plaintiff contends that Defendants acted with intent to cause her severe emotional distress by sending her out to clubs without cover.[47]  (Pl.'s Resp. at 22.)  However, Plaintiff's allegations of malice are nothing more than acts of wrongdoing done "with reckless disregard for the safety of others." *Murphy*, 282 Ga. at 203-04 & n.6, 647 S.E.2d at 60.  Accordingly, the Court finds that Defendants are entitled to official immunity, and summary judgment is granted as to Plaintiff's state law claims against them.

CONCLUSION

For the reasons discussed above, the Court grants Defendants' motion for summary judgment as to the following claims:

1.  Sexual harassment claim against the City.

2.  Section 1981 claim against the City for discrimination.

3.  Title VII and § 1981 retaliation claims against the City other than those based on the transfer from Vice to Patrol and the September 2006 Letter of Counsel.

4.  Claims arising from Plaintiff's voluntary transfer to the Marshal's Office.

---

[47]Plaintiff asks the Court to consider other alleged acts intended to cause her severe emotional distress, but she has pointed the Court to insufficient evidence in the record to support them.  Plaintiff also appears to contend that the Letter of Counsel from Boren was intended to cause severe emotional distress, and although there are genuine issues of material fact as to whether Boren had a retaliatory motive for sending the letter, Plaintiff points to nothing that would support a finding that Boren intended to cause her severe emotional distress.

5. Equal protection claims against the City.

6. First Amendment claims.

7. State law claims.

8. Claims against the following defendants in their individual capacities: Poydasheff, Hawk, Todd, Swiney and Barron.

9. Claims against Boren in his individual capacity as to any claims other than the § 1981 retaliation claims based on the transfer and the September 2006 Letter of Counsel.

10. Claims against Walton, Spear and Horiuchi in their individual capacities as to any claims other than the § 1981 and equal protection claims based on undercover working conditions.

The Court denies Defendants' motion as to the following claims, which are the only claims remaining to be tried:

1. Title VII claim against the City for discrimination based on unfavorable undercover working conditions.

2. Title VII and § 1981 claims against the City for retaliation, based on Plaintiff's transfer from Vice to Patrol and the September 2006 Letter of Counsel.

3. Section 1981 claims against Boren in his individual capacity based on Plaintiff's transfer from Vice to Patrol and the September 2006 Letter of Counsel.

4. Section 1981 and equal protection claims against Horiuchi, Spear and Walton in their individual capacities based on Plaintiff's undercover working conditions.

IT IS SO ORDERED, this 23rd day of July, 2008.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE